## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BALMUCCINO, LLC, a California
Limited Liability Company,

       Plaintiff,

   v.

STARBUCKS CORPORATION, a
Washington Corporation; and DOES 1
through 100, inclusive,

       Defendants.

CASE NO. 24-CV-06214

**PLAINTIFF'S OPPOSITION TO
MOTION TO DISMISS
COMPLAINT**

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 1

III.    PROCEDURAL HISTORY ................................................................................. 3

IV.     LEGAL ARGUMENT ......................................................................................... 5

        A.      The New York Courts Have Jurisdiction over Starbucks ............................ 5

                1.      In the Absence of Jurisdictional Discovery to the Contrary, Starbucks is
                        Subject to General Personal Jurisdiction in New York .............................. 6

                2.      Even Absent General Jurisdiction, Starbucks is Subject to Personal
                        Jurisdiction in New York ............................................................................. 7

                        a.      Even One Transaction in New York Can Suffice to Afford a New
                                Court Jurisdiction over a Matter in Diversity .................................... 7

                        b.      Starbucks's Heavy Reliance on *V Cars, LLC v. Israel Corp.* Is
                                Misplaced .......................................................................................... 9

                        c.      The Court Should Find that it Has Personal Jurisdiction ................ 13

                        d.      The Exercise of Personal Jurisdiction over Starbucks Comports
                                With Due Process ............................................................................ 16

                        e.      Balmuccino is Entitled to Jurisdictional Discovery ....................... 17

        B.      Neither Res Judicata Nor Collateral Estoppel Bar Balmuccino's Claims ............. 18

                3.      The Instant Case Has Never Been Substantively Adjudicated for Purposes
                        Of Res Judicata ......................................................................................... 18

                4.      Plaintiff Has Not Had a Full and Fair Opportunity to Present Its Case or
                        Have the Issues Substantively Addressed for Purposes of Collateral
                        Estoppel...................................................................................................... 18

        C.      Balmuccino's Claims are Not Time Barred ............................................... 20

        D.      Balmuccino States a Viable Claim for Breach of Contract and Breach of
                Confidence, As well as for Trade Secret Violation .................................... 23

V.      CONCLUSION ................................................................................................. 30

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*24 Seven v. Martinez,*
    2021 WL 276654 (S.D.N.Y. Jan. 26, 2021) ....................................................... 28, 29

*Abbacor, Inc. v. Miller,*
    2001 WL 1006051 (S.D.N.Y. Aug. 31, 2001) .................................................... 17

*Bakalar v. Vavra,*
    2006 WL 2311113 (S.D.N.Y. Aug. 10, 2006) .................................................... 21

*Balmuccino, LLC v. Starbucks Corp.,*
    2024 WL 4262805 (9th Cir. Sept. 23, 2024) ..................................................... 4, 9

*Big Vision Private Ltd. v. E.I. Dupont De Nemours & Co.,*
    1 F. Supp. 3d 224 (S.D.N.Y. 2014) .................................................................. 30

*Bohn v. Bartels,*
    620 F.Supp.2d 418 (S.D.N.Y.2007) ................................................................. 5

*Cypress Creek Intermediaries, Inc. v. Westport Ins. Corp.,*
    2023 WL 1779641 (S.D.N.Y. Feb. 6, 2023) ..................................................... 20

*Daimler AG v. Bauman,*
    571 U.S. 117 ................................................................................................... 6

*Deer Consumer Prods., Inc. v. Little,*
    35 Misc.3d 374, 938 N.Y.S.2d 767 (Sup.Ct. N.Y. Cnty. 2012) ................................. 7

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,*
    7 N.Y.3d 65 (2006) .......................................................................................... 12

*DiStefano v. Carozzi N. Am., Inc.,*
    286 F.3d 81 (2d Cir. 2001) ............................................................................... 5

*Fischbarg v. Doucet,*
    9 N.Y.3d 375 (2007) ....................................................................................... 11

*Goldlawr, Inc. v. Heiman,*
    369 U.S. 463 (1962) ........................................................................................ 22

*Grand River Enters. Six Nations, Ltd. v. Pryor,*
    425 F.3d 158 (2d Cir.2005) .............................................................................. 5

ii

*HC2, Inc. v. Delaney*,
   510 F. Supp. 3d 86 (S.D.N.Y. 2020) ................................................................................. 15

*Heyman v. AR. Winarick, Inc.*,
   325 F.2d 584 (2d Cir. 1963) ................................................................................... 25, 26

*Hoffkins v. Monroe-2 Orleans Boces*,
   2007 WL 1288210 (W.D.N.Y. May 2, 2007) ..................................................................... 23

*Holborn Corp. v. Sawgrass Mut. Ins. Co.*,
   304 F. Supp. 3d 392 (S.D.N.Y. 2018) ............................................................................. 20

*Huynh v. Chase Manhattan Bank*,
   465 F.3d 992 (9th Cir.2006) ........................................................................................ 23

*International Shoe v. Wash.*,
   326 U.S. 310 (1945) ............................................................................................ 10, 16

*Investment. Science., LLC v. Oath Holdings Inc.*,
   2021 WL 3541152 (S.D.N.Y. Aug. 11, 2021) ..................................................................... 29

*K.C.P.L., Inc. v. Nash.*,
   1998 WL 823657 (S.D.N.Y. Nov.24, 1998) ........................................................................ 8

*Kane v. University of Rochester*,
   2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) ................................................................... 14

*Kernan v. Kurz–Hastings, Inc.*,
   175 F.3d 236 (2d Cir.1999) .......................................................................................... 5

*L.A. Printex Industries, Inc. v. At Last Sportswear, Inc.*,
   2009 WL 1285923 (S.D.N.Y. May 4, 2009) ...................................................................... 22

*Laufer v. Ostrow*,
   55 N.Y.2d 305, 449 N.Y.S.2d 456 (1982) ......................................................................... 6

*Lebel v. Tello*,
   272 A.D.2d 103, 707 N.Y.S.2d 426 (1st Dep't 2000) ............................................................. 7

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 ......................................................................................................... 12

*McGowan v. Smith*,
   52 N.Y.2d 268 (1981) ................................................................................................ 6

*Nee v. HHM Fin. Services, Inc.*,
   661 F. Supp. 1180 (S.D.N.Y. 1987) ............................................................................ 10, 12

*New Phone Co. v. N.Y.C. Dep't of Info. Tech. & Telecomms.*,
   2011 WL 6132256 (E.D.N.Y. Mar. 7, 2011) ........................................................................ 19

*Newbro v. Freed*,
   337 F. Supp. 2d 428 (S.D.N.Y. 2004) ................................................................................ 16

*Pauwels v. Deloitte LLP*,
   2020 WL 818742 ("*Pauwels*") ..................................................................................... 24, 25

*PDK Labs, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir.1997) ......................................................................................... 5, 16

*Pederson v. Potter*,
   11 P.3d 833 (Wash. Ct. App. 2000.) ................................................................................. 18

*Perrin v. Pearlstein*,
   314 F.2d 863 ..................................................................................................................... 21

*Realty of N.Y., Inc. v. Town of Wawayanda*,
   572 F.3d 93 (2d Cir. 2009.) .............................................................................................. 18

*Rockaway Bev., Inc. v. Wells Fargo & Co.*,
   378 F. Supp. 3d 150 (E.D.N.Y. 2019) .............................................................................. 13

*Rockshots, Inc. v. Comstock Cards, Inc.*,
   1990 WL 74514 (S.D.N.Y. May 29, 1990) ...................................................................... 10

*Saratoga County Chamber of Commerce Inc. v. Pataki*,
   100 N.Y.2d 654, 662 ........................................................................................................ 21

*Topps Co. v. Gerrit J. Verburg Co.*,
   961 F. Supp. 88 (S.D.N.Y. 1997) .................................................................................... 17

*Transactions, Inc.*,
   920 F.2d 171 (2d Cir. 1990) ....................................................................................... 23, 24

*USA All., LLC v. All Nat., LLC*,
   2006 WL 8461811 (S.D.N.Y. Jan. 4, 2006) .................................................................... 10

*V Cars, LLC v. Israel Corp.*,
   902 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................................... 9, 10, 12

*Williams v. Preeminent Protective Services, Inc.*,
   81 F. Supp. 3d 265 (E.D.N.Y. 2015) .............................................................................. 5, 11

*Zabit v. Brandometry, LLC*,
   540 F. Supp. 3d 412 (S.D.N.Y. 2021) ................................................................. 23, 29

## Rules

CPLR Section 302............................................................................................. 7, 8, 17

Section 301 or section 302(a)(1) of the New York Civil Practice Law and Rules ................... 5, 6

Section 302(a)(1) of New York's Civil Practice Law and Rules .................................... 7, 9, 11, 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

As the Complaint in the instant lawsuit provides, Plaintiff Balmuccino, LLC, (alternatively, "Balmuccino" or "Plaintiff") invested substantial time and resources in developing a fully-realized concept for coffee-flavored lip balms. Balmuccino shared that concept and development with Starbucks Corporation (alternatively, "Starbucks" or "Defendant") at a meeting on October 19, 2017, which was held with Starbucks's Head Of Product Development in New York City ("Meeting"). Balmuccino attended the Meeting to advance a joint venture with Starbucks and was assured that any exchange of its trade secret information would remain confidential, forming a contract. Balmuccino maintains that Starbucks thereafter breached the contract and misappropriated the information it confided in Defendant and that Starbucks misused it to promote its products and increase sales. The harm Balmuccino experienced in this regard had its genesis in New York, so that New York is the proper venue for Balmuccino's lawsuit. Accordingly, the Court should deny Starbucks's Motion to Dismiss the lawsuit.

## II.   STATEMENT OF FACTS

As delineated in the Complaint, Balmuccino is a California limited liability company doing business in Los Angeles, California. It developed a line of coffee-flavored lip balm products that it introduced to coffee giant Starbucks.[1] It did so in hopes of developing a mutually beneficial business model that could advance Defendant's own products and that would financially advantage both Plaintiff and Defendant.

---

[1] Unless otherwise indicated, the facts in the first two paragraphs of the "Introduction and Nature of the Action are all from Paragraphs 1 and 3 of Plaintiff's Complaint."

To advance this goal, Balmuccino met with Starbucks's Head of Product Development and Senior Vice President, Mesh Gelman, in New York City in October 2017. There, Balmuccino's team presented Mr. Gelman with a pitch deck, as well as fully realized prototypes for a lip balm line tailored to Starbucks's coffee products. Despite Balmuccino's detailed disclosure of its product development, Gelman refused to enter into a Non-Disclosure Agreement (alternatively, "NDA"), stating that the Meeting and the items discussed therein were entirely confidential (Complaint, ¶ 16).[2] Gelman represented that Starbucks could be trusted because Starbucks's CEO had facilitated the meeting between Balmuccino's members ("Members") and Gelman.

For over an hour during the Meeting, Mr. Gelman extensively quizzed Plaintiff's team, especially Balmuccino's chemist, Mr. Spinnato, about Plaintiff's concepts and products, the creation process of lip balms, the different flavor possibilities, and other detailed inquiries. (*Id.,* at ¶ 17.) Chemist Spinnato discussed details of the entire process, including the names and locations of the material suppliers and manufacturers that had been involved during the nearly two-year development process of Balmuccino's lip balm products. (*Id.,* at ¶ 18.) During Mr. Gelman's questioning of the Balmuccino team, Gelman's assistant, Mr. Ginsberg, took copious notes while Mr. Gelman listened intently. (*Id.,* at ¶ 19.)

At the Meeting's end, Mr. Gelman asked to hold on to Balmuccino's pitch deck so that he could run the idea "up the flagpole" and explore the possibility of a partnership or joint venture moving forward. (*Id.,* at ¶ 20.) Two weeks after the Meeting, Mr. Gelman emailed Samantha Lemole--one of Balmuccino's managing members who had met with

[2]These facts are delineated in the Complaint filed with the instant New York Court, which was filed as ECF 1 on August 16, 2024.

Gelman in New York--to say he was leaving Starbucks to start his own consulting business. (*Id.,* at ¶¶ 10, 13, 21). He did not discuss the status of the product pitch that had taken place during the Meeting. (*Id*., at ¶ 21.) Clearly, his exit was in place before the Meeting. (*Id*.)

With Gelman's departure from Starbucks, Plaintiff was left in limbo as to Starbucks's intentions. (*Id.,* at ¶¶ 1, 21.) Then, in 2018, Balmuccino learned Starbucks's Research and Development personnel had contacted one of Balmuccino's suppliers to create prototypes for Starbucks-branded lip balm-type products and lip balm cases, using specifications the potential manufacturer had received. Those specifications matched the ones that Plaintiff had provided to Mr. Gelman during the Meeting in New York. (*Id*., at ¶¶ 1, 23.)

It is undisputed that in 2019, Starbucks ran a promotion to drive business to its retail stores--a disproportionately high share of which were sited in California. (*Id*., at ¶¶ 1, 24-26.) The promotion involved four coffee-flavored lipsticks/glosses. (*Id*., at ¶¶ 1, 24.) Balmuccino maintains those products derived from the lip balm products it had introduced to Starbucks at the Meeting. As argued below, the New York Meeting was the springboard for, and the situs of, the subsequent harm caused Balmuccino because it was there that Starbucks's Head of Product Development elicited precise information on the chemistry and development of Plaintiff's lip balm products which Starbucks subsequently misappropriated for its own commercial use. Plaintiff maintains it has made out a timely and viable case for liability against Starbucks.

### III. <u>PROCEDURAL HISTORY</u>

The parties agree as to the chronology of the following procedural facts, as posed in the Motion to Dismiss: Balmuccino initially filed suit in California in 2019, where its business operations were sited, where all four LLC members resided, where all development

efforts took place, and where all marketing efforts were created. Nevertheless, the trial court surprisingly dismissed the suit for lack of personal jurisdiction in 2020 and the California Court of Appeal affirmed the dismissal in 2022. As alleged in the Complaint, on October 21, 2022, five days *before* the Court of Appeal issued its remittitur which formally dismissed the appeal in California for lack of jurisdiction, Balmuccino initiated suit in the U.S. District Court for the Western District of Washington on diversity grounds in Case No. 2:22-cv-1501-TLF. As such, Balmuccino had an active action against Starbucks from October 18, 2019 to the time of filing with the District Court, so that Defendant continually had timely notice of Plaintiff's claims throughout this period. In turn, Defendant suffered no prejudice as to the gathering of evidence, which evidence has never changed, as Plaintiff had continuously pursued its claims. (Complaint, at ¶ 36.)

On February 21, 2023, the District Court granted Balmuccino leave to file an amended complaint and a claim under the federal Defend Trade Secret Act ("DTSA") was added. Thereafter, the parties contested whether California or Washington law should apply. After a conflict of law analysis, the district court ruled Washington law prevailed over that of California, a finding the Ninth Circuit then affirmed. *Balmuccino, LLC v. Starbucks Corp.*, 2024 WL 4262805 (9th Cir. Sept. 23, 2024). In that the limitations period in Washington was procedural in nature, the ruling of the Ninth Circuit was procedural, <u>not substantive</u>.

To preserve its position and avoid any claim of prejudice, Balmuccino filed the instant Complaint in New York on August 21, 2024. (ECF 1.) If the instant court hears the case on its merits, which Plaintiff maintains should happen, it will be the <u>first</u> opportunity Plaintiff has had to substantively advance any of its various claims against Starbucks.

## IV.  LEGAL ARGUMENT

### A.  The New York Courts Have Jurisdiction over Starbucks

This matter is before the instant court ("Court") on diversity grounds.  In this regard, Balmuccino maintains that the Court has both general jurisdiction over Balmuccino's litigation pursuant to section 301 or section 302(a)(1) of the New York Civil Practice Law and Rules ("CPLR"), since Starbucks has, or with discovery, will be found to have a continuous presence in New York and because the claims in this case were initiated and undertaken by Defendants in  New York City.

Once, as here, a defendant challenges a court's exercise of personal jurisdiction, plaintiff bears the burden of establishing that jurisdiction is proper. (E.g., *Kernan v. Kurz–Hastings, Inc.,* 175 F.3d 236, 240 (2d Cir.1999).  However, **where no discovery has taken place and no evidentiary hearing has been held, the plaintiff need merely make a *prima facie* showing that jurisdiction over defendant is proper**. *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 165 (2d Cir.2005); *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997).[3]  It is within the Court's discretion to find that such a showing has been made on the pleadings and affidavits. E.g., *Williams v. Preeminent Protective Services, Inc.,* 81 F. Supp. 3d 265, 269 (E.D.N.Y. 2015) ("*Williams*").  When undertaking a jurisdictional analysis, the court must construe the pleadings in a light most favorable to the plaintiff, and resolve all doubts in plaintiff's favor. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  New York law applies when there is either general or specific personal jurisdiction in a case tried on diversity grounds.

---

[3] Plaintiff recognizes that even when a prima facie showing of jurisdiction is made "[e]ventually personal jurisdiction must be established by a preponderance of the evidence," whether "at an evidentiary hearing or at trial." *E.g., Bohn v. Bartels,* 620 F.Supp.2d 418, 424 (S.D.N.Y.2007).

1.    **In the Absence of Jurisdictional Discovery to the Contrary, Starbucks is Subject to General Personal Jurisdiction in New York**

Even assuming arguendo, as Starbucks does, that it is a foreign corporation, CPLR Section 301 ("Section 301") provides that a federal court sitting in diversity in New York may impose jurisdiction over such a corporation when it is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence'" there. *Laufer v. Ostrow,* 55 N.Y.2d 305, 309–10, 449 N.Y.S.2d 456, 458 (1982) (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272 (1981)). In this regard the Supreme Court has found that consistent with due process, 'a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary.' *Daimler AG v. Bauman*, 571 U.S. 117, 139. However, general jurisdiction may only be imposed on such a corporation in a state if its contacts are "so continuous and systematic" in light of national and global activities, that it is "essentially at home" in that state. (*Id*., at 139.)

Here, Starbucks maintains Washington is its place of incorporation and Plaintiff has no grounds upon which to challenge this. However, it is less clear whether its principal place of business is also in Washington state, especially in the absence of jurisdictional discovery. Clearly, the focus of its business development is less than clear given that the regional center where Balmuccino met the person tasked with product development was not in Washington state, but in New York City. It was there that Balmuccino's team was asked to disclose, and, in fact, did disclose, the chemistry and potential application of the its product design to Mesh Gelman. Starbucks does not dispute that Gelman held the role of **Head of Product Development** and that he was Senior Vice President at Starbucks. No discovery has been had on this issue or on whether other key personnel took Starbucks outside of Washington as its principal place of business. At this early stage of the case, therefore, there are potential

grounds for the court to impose general jurisdiction over the parties. This is especially so since New York was not just an incidental venue for the business discussions had there at the Meeting. Clearly, Starbucks had assets, and offices and personnel at home in New York. In addition, Starbucks, with stores seemingly around every corner, would be hard-pressed to deny that it has a continuous and continuing presence in New York. More broadly, Balmuccino is informed and believes that jurisdictional discovery will disclose that in addition to many retail stores, Starbucks's regional New York offices are the center of significant product discussions and design that impacts the overall significance to Starbucks's operations.

2. **Even Absent General Jurisdiction, Starbucks is Subject to Personal Jurisdiction in New York**

a. **Even One Transaction in New York Can Suffice to Afford a New Court Jurisdiction over a Matter in Diversity**

CPLR Section 302 ("Section 302") provides that a court may exercise personal jurisdiction over a non-domiciliary who "transacts any business" within New York or "contracts anywhere to supply goods or services in the state," provided that the cause of action arose out of that transaction of business. *Deer Consumer Prods., Inc. v. Little,* 35 Misc.3d 374, 938 N.Y.S.2d 767 (Sup.Ct. N.Y. Cnty. 2012) (citing *Lebel v. Tello,* 272 A.D.2d 103, 104, 707 N.Y.S.2d 426, 427 (1st Dep't 2000)).[4] Pursuant to Section 302, personal jurisdiction may also be had when a party "owns, uses or possess any real property situated

_____

[4]In part, Section 302(a)(1) of New York's Civil Practice Law and Rules provides that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . ., who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state" or "commits a tortious act within the state [other than defamation] . . . regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state . . .."

within the state." (Section 302, subs. 4.)  In sum, even were general jurisdiction lacking, Section 302 permits the Court to find that personal jurisdiction may obtain where an alleged cause of action arises out of a defendant's contacts with New York.  More particularly, the Court should assess the totality of the circumstances to determine whether Starbucks conducts purposeful activity in New York. *See K.C.P.L., Inc. v. Nash*. 1998 WL 823657, at *4 (S.D.N.Y. Nov.24, 1998).

Here, the allegations make plain that the Meeting was not just exploratory in nature, but resulted in the key discussion between Gelman and Balmuccino's chemist about the actual formulation and development of Balmuccino's products—with the understanding that such sensitive information was being transmitted to Starbucks in the utmost secrecy and with the implied understanding that Starbucks's commercial use of that information was an implied contract that Balmuccino would be compensated for the fruits of its labor.

In this regard, Starbucks concedes it ran a national promotion in 2019—a promotion Balmuccino maintains was derived from its work product, and which product was detailed in the pitch deck and fully realized prototypes for Plaintiff's product line, which had been designed specifically for Defendant. (Complaint, ¶ 15.)  Further, Starbucks's Head of Product Development kept the pitch deck used at the Meeting and impliedly accepted the fact that use of Balmuccino's product design would redound to the financial benefit of Balmuccino.  In this regard, the Court must accept as true that at the Meeting, Plaintiff had delivered a fully realized product concept to Defendant in a branded, pocketable lip balm delivery mechanism, along with fully-formulated samples that smelled and tasted like the flavors of Defendant's beverages. (*Id*., at ¶ 27.)

It must also accept as true that Starbucks then advanced a promotion based on such formulation that was meant to drive retail sales.  Notably, Defendant does not even deny that its promotion reached the New York market or that it has a very significant presence in New York.  Without the Meeting with Starbucks's head of product development, Balmuccino maintains there would have been no such promotion.  Clearly, Balmuccino has sufficiently alleged that the harm it has suffered arose from a business transaction in New York.

### b.   Starbucks's Heavy Reliance on *V Cars, LLC v. Israel Corp.* Is Misplaced

Further, Starbucks's heavy reliance on the case of *V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349 (S.D.N.Y. 2012) ("*V Cars*") is misplaced.  There, the court found that "exploratory meetings" in New York that led only to a proposal that was subject to further negotiations, including meetings outside of New York, was insufficient to center personal jurisdiction in New York. [Motion to Dismiss ("MTD"), at p. 11.]  The court noted that to determine if jurisdiction exists under Section 302(a)(1), a court must assess "whether the defendant transacts any business" in New York "and, if so . . . whether the cause of action 'arises from'" such transaction. (*Id*. at 360.)  In this regard, the "overriding" factor is whether a defendant has "purposely" availed itself "of the privilege of conducting activities within New York." (*Id*.)  There must also be a substantial relationship or "articulable nexus" between a plaintiff's claim and the actions that occurred in New York. (*Id*.)

However, unlike in the *V Cars* case, in the instant matter it cannot be said that the meeting in New York was unproductive, insubstantial, or even simply exploratory. (*Id.,* at 361, 362.)  Moreover, Balmuccino alleges that it is because of this New York conference that Starbucks was able to use, and did use, the confidential information disclosed at the Meeting to contact Balmuccino's product manufacturer with product specifications that matched those

9

disclosed in the Meeting. (Complaint, ¶¶ 1, 23.)  That is, the Meeting cannot be described as

somehow minor, random or attenuated. *V Cars*, supra, 902 F. Supp. 2d at 362.

Moreover, in the *V Cars* case, Defendant Israel Corp., through its chairman, was not

asked to sign a non-disclosure or confidentiality agreement. *Id*., at 352.[5]  At the meeting in

New York in that case, Plaintiff understood Defendant's representative was simply attending

to collect due diligence information and to advise Defendant on whether he supported a joint

venture. *Id*., at 353.  By contrast, Balmuccino maintains that the parties to the Meeting

understood that if Starbucks attempted to use its product development to its own advantage—

which it eventually did to try to drive retail sales—that Balmuccino would be compensated

for its product creation which was specific to Starbuck's coffee flavors. "Preliminary

negotiations in New York that are 'essential to the existence of the contract' provide

sufficient contact to establish New York's personal jurisdiction over the non-domiciliary

defendant." *Nee v. HHM Fin. Services, Inc.*, 661 F. Supp. 1180, 1184 (S.D.N.Y. 1987).

Further, while mere solicitation of business may not suffice to conclude a defendant is

"doing business" with plaintiff, "[s]ubstantial solicitation" plus 'very little more . . .will

support such a finding." ' " *Rockshots, Inc. v. Comstock Cards, Inc.*, 1990 WL 74514, at *3

(S.D.N.Y. May 29, 1990), citing *Nee v. HHM Fin. Servs., Inc.*, 661 F. Supp. at 1183.  In this

regard, purposeful activities in New York constitute "minimum contacts . . . such that the

maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *USA All., LLC v. All Nat., LLC,* 2006 WL 8461811, at *5 (S.D.N.Y. Jan. 4, 2006)

(citing *International Shoe v. Wash.*, 326 U.S. 310, 326 (1945) ("*Int'l Shoe*").

---

[5]There is a question over whether a negotiator for Defendant in *V Cars* signed a non-disclosure agreement and Plaintiff never produced a copy of one. *V Cars*, *supra,* 902 F. Supp. 2d at 353.

Moreover, case law from the district courts of New York clearly split on what constitutes sufficient contacts in New York to establish an action under Section 302(a)(1). Illustratively, in *Williams*, *supra*, 81 F. Supp. 3d at 271, the Court found that even if defendant never enters New York, so long as the purposefulness and substantial relationship tests are also satisfied, "proof of one transaction in New York" suffices to "invoke jurisdiction [pursuant to Section 302(a)(1)]." *Id*. Thus, while it may not be possible to precisely delimit acts that constitute a business transaction, it "is the quality of the defendants' New York contacts that is the primary consideration." *Id*., citing *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).

Here, the Meeting was clearly a purposeful transaction in that Starbucks availed itself "of the privilege of conducting activities within the forum State [of New York], thus invoking the benefits and protections of its laws." *Id*. Starbucks sought to confer upon itself a unique benefit in transacting business in its New York offices, and 'availed' itself of the forum when it met with the Balmuccino team to elicit information about a product from which it thought it could financially benefit. This was clearly purposeful availment of a New York forum.

Further, it is unequivocal from the facts of the Complaint that there was a "substantial relationship" between the New York Meeting and the financial benefit that Starbucks expressly hoped to derive from that conference. There is no other way to explain why the Head of Product Development appropriated Balmuccino's pitch deck thereafter. Gelman left the employ of Starbucks shortly after the Meeting and to date Plaintiff has been unable to conduct jurisdictional discovery from which it could assess whether New York remained a center of communications between Gelman and Defendant either before or after he left Starbuck's employ.

Further, even the *V Cars* case acknowledges that "[a] single act within New York will, in the proper case, satisfy the requirements of section 302(a)(1)." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 62 (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,* 7 N.Y.3d 65, 72 (2006)) ("[W]hen the requirements of due process are met, as they are here, a sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute")); *V Cars*, *supra*, 902 F. Supp. 2d at 360–61. Indeed, cases upon which *V Cars* relies expressly recognize that preliminary contract negotiations may support a finding of personal jurisdiction. (*Id.*, at 362.)

Illustratively, in *Nee v. HHM Fin. Services, Inc.*, 661 F. Supp. 1180, 1183–84 (S.D.N.Y. 1987) the court found, "[a] single transaction of business in New York, out of which the cause of action accrues, may be sufficient for the assertion of long-arm jurisdiction under CPLR § 302(a)(1)." That is, the 'relevant inquiry is whether the defendant has performed "purposeful acts" in New York "in relation to the contract, albeit preliminarily or subsequent to its execution." (*Id.*, emphasis added.) Balmuccino fully anticipated contract formation after the disclosure of its confidential information, but Gelman suddenly left Starbucks's employ.

Moreover, the injury suffered by Plaintiff was felt by Balmuccino in New York where the Meeting was held. It was there that Balmuccino disclosed its trade secrets, and it was where a large regional market was headquartered. The promotion Starbucks ran in 2019 was meant to drive sales throughout the United States, and clearly would have included New York. Only discovery can establish the degree to which Plaintiff suffered damages in that market due to the misappropriation of its trade secrets and breach of contract. New

York's "long-arm" statute allows its courts to exercise jurisdiction over non-domiciliaries who transact any business within the state, provided that the transactions are purposeful and that there is a substantial relationship between the transactions and the claims being asserted.

### c.     <u>The Court Should Find that it Has Personal Jurisdiction</u>

Plaintiff's Complaint alleges, *inter alia,* breach of an implied-in-fact contract, breach of an oral contract and breach of confidence. Courts often find and enforce implied promises in light of a promisor's word and conduct given the surrounding circumstances. *Rockaway Bev., Inc. v. Wells Fargo & Co.*, 378 F. Supp. 3d 150, 161 (E.D.N.Y. 2019). That is, even though an express contract does not exist, contract formation may be inferred from the parties' presumed intention as derived from their conduct. *Id.* In addition to the terms evinced by the parties' conduct, New York law imposes an implied covenant of good faith and fair dealing on all contracts, such that neither parties' actions will effectively destroy or diminish the right of the other party to realize the fruits of the contract. *Id*.

As alleged in their Complaint, Balmuccino's representatives met with the head of Starbucks's product development division with the understanding that their discussions with Gelman were confidential, a term of discussion which he accepted when he represented the same, noting that Starbucks could be trusted since the company's CEO had facilitated the meeting. (Complaint, ¶¶ 1, 16.) On this basis, Balmuccino permitted its chemist and others of its contingency to divulge sensitive information about Plaintiff's creative processes, including its concepts and products, and the creation process of lip balms. *Id*., at ¶ 17. Indeed, Balmuccino's chemist divulged the entire creative process and the contact information for Plaintiff's material suppliers and manufacturers. *Id*., at ¶ 18. By virtue of the fact that Gelman ended the meeting by appropriating the pitch deck, it was clearly

understood that Balmuccino would be compensated for any commercial use of its confidential information.

Instead, Starbucks secretly initiated a promotion built on Balmuccino's work product, without its consent or monetary consideration. Balmuccino offered up confidential information that Starbucks accepted with a promise of confidentiality—only to exploit Balmuccino's research and development to its own advantage to drive retail sales. In so doing, it breached the covenant of good faith and fair dealing.

Alternatively, the facts of the confidential exchange of information had between Balmuccino and Starbucks supports a claim of breach of oral contract. Balmuccino offered to exchange proprietary information with Starbucks in exchange for recompense for its commercial use. Such consideration was clearly understood in that Balmuccino would otherwise have had no incentive to disclose its formulaic secrets, and which formulas had been developed expressly to match Starbucks's products. *Id*., at ¶¶ 55-56. Clearly, Balmuccino trusted in what it believed was the integrity and greater commercial experience of Starbucks when it disclosed the product of its years of research and development.

Next, to state a claim for breach of confidence under New York law, a plaintiff must plead that "(1) the defendant assumed a duty of confidentiality, (2) the defendant intentionally, knowingly, or negligently breached that duty, and (3) the plaintiff was damaged as a result of that breach." *Kane v. University of Rochester*, 2024 WL 1178340, at *12 (W.D.N.Y. Mar. 19, 2024). Balmuccino was invited to the Meeting to discuss its confidential research and development, which Starbucks's Head of Product Development knew. Instead of honoring that known desire for, and concern over, product confidentiality and over the

processes attending the creation of that product, Gelman deflected concerns over putting a Non-Disclosure Agreement in place, by insisting that an NDA was needless.

Plaintiff maintains Starbucks assumed a duty of confidentiality, especially in light of the fact Balmuccino unsuccessfully tried to pursue a Non-Disclosure Agreement. Waiving it off while promising secrecy, Starbucks "used improper means to acquire knowledge of Plaintiff's trade secrets." (Complaint, at ¶ 76.) Balmuccino maintains that thereafter, Starbucks intentionally, knowingly, or negligently breached its duty of confidentiality when it integrated Balmuccino's design into its promotional products in 2019 for its own pecuniary advantage to drive retail sales and to the damage of Balmuccino. E.g., *id*., at ¶¶ 65-66.

In sum, Balmuccino's disclosures to Starbucks' Head of Product Development were made in confidence and the parties stood in a position of trust—a trust that Gelman not only encouraged but required in lieu of an NDA. *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 101 (S.D.N.Y. 2020). As even the case law upon which Starbucks's relies provides, a duty not to disclose confidential information arises when the recipient of that information has accepted that a confidential relationship "implicitly" exists "by the actions of the parties or other circumstances.) (*Id*.)

It is therefore disingenuous of Starbucks to suggest Balmuccino is unable to establish specific personal jurisdiction over Starbucks because the exchanges had at the Meeting with Gelman do not adequately undergird claims of a breach of implied-in-fact or oral contracts or a claim for breach of confidence. (MTD, p. 15.) Gelman was Starbucks's Head of Product Development. He knew exactly what he was doing when he culled proprietary information from the Balmuccino team—information that Balmuccino maintains was then used by Starbucks to its own economic advantage to drive customers to its outlets across the country.

Plaintiff relied on the false assurances of Defendant that its information was safe and would only be used to the mutual benefit of the parties through a partnership or joint venture. (Complaint, at ¶ 20.)

Moreover, it is little more than question begging for Starbucks to say that "[a] single short arms-length meeting between two business entities cannot plausibly form a confidential relationship." (MTD, p. 15.) First, it is almost laughable that a global presence like Starbucks puts a small California business like Balmuccino in the same procedural and substantive posture with itself. This is akin to Goliath measuring David to be his negotiating equal. Second, it was Gelman who promised confidentiality, and as the Head of Product Development, he committed Starbucks to what the Balmuccino team clearly thought was a trustworthy position.

### d. The Exercise of Personal Jurisdiction over Starbucks Comports With Due Process

Contrary to Starbucks's position, Balmuccino maintains that the exercise of personal jurisdiction comports with due process guarantees of the United States Constitution. In this regard, due process "requires that a defendant have enough minimum contacts with the forum state so that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *PDK Labs., Inc. v. Friedlander*, 103 F.3d 1105, 1110 (2d Cir. 1997) (quoting *Int'l Shoe*, *supra*. 326 U.S. at 326 (1945)). Due process is satisfied if Defendants "purposely and sufficiently availed themselves of the privileges of conducting business in New York, so that it would be reasonable to anticipate being subject to suit in New York." *Newbro v. Freed*, 337 F. Supp. 2d 428, 431 (S.D.N.Y. 2004). Here, Starbucks does not contest that it has at least regional offices in New York state, so that it would not be unreasonable for it to be sued in New York. Generally, "if jurisdiction is proper under the

CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits." *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y. 1997); see *Abbacor, Inc. v. Miller*, 2001 WL 1006051, at *4 (S.D.N.Y. Aug. 31, 2001).

Given its huge corporate footprint, including its significant corporate presence in New York, and its extraordinary resources relative to those of Balmuccino, it is disingenuous for Starbucks to maintain it would be "unduly burdensome" for it to litigate the instant matter in New York. Indeed, it begs the question to suggest that Starbucks has "minimum connections to the state." The fact that Balmuccino met with the Head of Product Development in New York belies any representation that Starbucks' presence in New York is of minimal significance. In any event, jurisdictional discovery should be permitted to clarify this issue.

### e.     Balmuccino is Entitled to Jurisdictional Discovery

Starbucks claims Balmuccino has failed to make a prima facie case for jurisdiction and therefore is not entitled to jurisdictional discovery. (MTD, p. 17). This, of course, begs the question. Starbucks maintains it has "previously submitted evidence that the Sip Kit concept was developed by the Starbucks marketing team located in Seattle" (MTD, p. 12, at n. 3) and that "that team did not misappropriate Balmuccino's concept." (MTD, p. 17) First, this Court is hearing *only* Starbucks' version of events, untested by discovery. Thus, Starbucks' argument is appropriate for closing argument, but even facially, it fails to account for the close proximity in time between the Meeting and Starbucks's personnel contacting a supplier for Balmuccino to ask about coffee-flavored lip balms. (Complaint, ¶ 22). More particularly, as to the 2018 contact with Balmuccino's supplier, Plaintiff was notified that employees within Defendant's Research and Development team had requested the creation of prototypes for Starbucks-branded lip balm and lip balm cases. *Id.*, at ¶ 23. Plaintiff was further informed that the specifications the potential manufacturer had received for these

prototypes **matched** those Gelman was given at the Meeting. *Id*. Coincidence? Maybe, but that should be for a jury to decide. Indeed, Balmuccino maintains neither that contact nor the sudden appearance of the Sip Kit that was created to celebrate the return of certain of Starbucks's products in April 2019 was coincidental. *Id*., at ¶ 24. In sum, Starbucks's worldview is neither uncontested nor incontestable.

### B. Neither Res Judicata Nor Collateral Estoppel Bar Balmuccino's Claims

#### 1. The Instant Case Has Never Been Substantively Adjudicated for Purposes of Res Judicata

It is incontestable that nothing of substance has been litigated in the instant lawsuit. The California lawsuit was a fight over whether that state's court had jurisdiction over the case and the trial court ruled it did not—a ruling the Court of Appeal affirmed. In the federal district court in Washington, the lower court ruled that the limitations period had run and that the case could not be saved by principles of equitable tolling. The Ninth Circuit affirmed that decision on procedural grounds. Critically, this Court has appropriately flagged that New York law provides that dismissing a claim only for lack of timeliness is not a judgment on the merits. *Cloverfield Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93 (2d Cir. 2009.)

#### 2. Plaintiff Has Not Had a Full and Fair Opportunity to Present Its Case or Have the Issues Substantively Addressed for Purposes of Collateral Estoppel

As noted by Starbucks, collateral estoppel is predicated, in part, on a party having had had a full and fair opportunity to present its case, such that its application does not work an injustice. *Pederson v. Potter*, 11 P.3d 833, 836 (Wash. Ct. App. 2000.) This presupposes that there has been a hearing on the substance of the case. No such hearing has ***ever*** been had in the instant matter. Indeed, heretofore the Courts have not even afforded Balmuccino an opportunity to conduct basic (or any) discovery--including on jurisdictional issues, let alone

substantive ones.  Not a single set of interrogatories, not a single request for production, not a single request for admissions or a single deposition has been conducted.  Starbucks has been able to litigate with a home court advantage in federal court, and there is absolutely no way that this court, or any court, could genuinely conclude that collateral estoppel would advance the ends of justice in this case.  Dismissal of the case in Washington was for untimeliness of suit and, in turn means that no issues were substantively decided for purposes of the collateral estoppel doctrine.  *See New Phone Co. v. N.Y.C. Dep't of Info. Tech. & Telecomms.*, 2011 WL 6132256, at *7–8 (E.D.N.Y. Mar. 7, 2011).

More particularly, to say that "Washington . . . has the more significant relationship to the case" belies the fact that the only negotiations in this case occurred in New York at a seminal meeting—indeed, the only meeting—between the principals – the exact fact the California courts relied upon in finding a lack of personal jurisdiction in California (judicial estoppel should prevent Starbucks from arguing the contrary). It is similarly impossible for the Court to conclude at this juncture, as Starbucks suggests, that litigating in the New York forum would focus solely on previously-known facts.  That conclusion becomes a self-fulfilling prophecy unless basic discovery is permitted—an opportunity which would be novel to this case.  To conclude, as Starbucks urges, and as the Washington courts ruled, that Starbucks's employees in Washington would have been the ones to perform or breach the contract since Starbucks is headquartered there puts the proverbial cart before the horse. Balmuccino's injuries were triggered at the Meeting once its members were forced to disclose trade secret information without benefit of an NDA.  What happened next, in the absence of objective discovery, is purely speculative.  As Starbucks itself has conceded, New

York has a longer limitations period for contract-related breaches, Balmuccino should not prematurely be stripped of an opportunity to benefit from the difference.

### C.     **Balmuccino's Claims are Not Time Barred**

Balmuccino acknowledges that Washington and New York have differing limitation periods for contracts that are non-written—three years in Washington and six years in New York. However, since a "choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage." *Cypress Creek Intermediaries, Inc. v. Westport Ins. Corp.*, 2023 WL 1779641, at *6 (S.D.N.Y. Feb. 6, 2023), citing *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018). In that jurisdictional discovery is needed here, Balmuccino maintains that any conclusion about the situs of this diversity case should await such discovery.

More particularly, while Starbucks argues that the first factor of the center of gravity test--the place of contracting, negotiation and performance--is at best neutral (MTC, p. 24), that conclusion is self-serving at best. Indeed, the contractual discussions were only had at the Meeting in New York with Starbucks's head of product development, and the disclosure of trade secrets were had only in New York--it was ground zero for the ensuing harm. Notwithstanding Starbucks's untested argument that its research and development is sited in Washington, it cannot contest that it has a significant regional presence in New York. At this stage of the litigation, it is impossible to know what Gelman did with Balmuccino's proprietary information after the Meeting. What is clear, however, is that the "most significant contacts with the matter in dispute" lie in New York--until formal discovery discloses otherwise. New York, not Washington, was where any agreement between the parties was arrived at and where acceptance was at least arguably made (*id*) when Gelman walked off with Balmuccino's pitch deck and with the specifications for Balmuccino's

products.   As the case law relied upon by Starbucks emphasizes, it was where "the last act necessary to the making of the alleged agreement occurred."  *Perrin v. Pearlstein*, 314 F.2d 863, 873.

Moreover, this case is subject to equitable tolling in that Plaintiff has diligently pursued its litigation against Starbucks.   As the procedural history of the case recited by both parties amply demonstrates, Balmuccino diligently pursued the instant litigation from its inception in California and the appellate court there, through to its refiling in Washington and then to the refiling in New York.  Illustratively, filing of the case in Washington occurred even before issuance of a remittitur by the California Court of Appeal and this case was filed in New York weeks before the Ninth Circuit's decision.  Thus, not a single day has passed since April 2019 without Balmuccino having an *active* lawsuit against Starbucks. Balmuccino merely seeks to have the case substantively heard.  That has not happened in the wake of the cases' summary disposition on jurisdictional grounds in California, and its dismissal on limitations grounds in Washington.

Equity, of course, aids the vigilant, and no argument can be made that Balmuccino slept on its rights. See *Bakalar v. Vavra*, 2006 WL 2311113, at *3 (S.D.N.Y. Aug. 10, 2006); cf. *Saratoga County Chamber of Commerce Inc. v. Pataki*, 100 N.Y.2d 654, 662 ["[i]t is well-settled in New York that "[t]he mere lapse of time, without a showing of prejudice, will not sustain a defense of laches."]  Further, there has been no substantive prejudice to Starbucks in that it has been continuously on notice of Balmuccino's allegations and it has preserved its substantive position in its defense of the prior, related suits, including through the use of declarations and other court filings.

Further, when the time between the resolution of a case in one forum and the subsequent filing in another forum rests on a fight over personal jurisdiction, equitable tolling is appropriate. Illustratively, when the plaintiff litigates the issue of a motion to dismiss for lack of personal jurisdiction, such that the action is dismissed, but then promptly, as here, refiles in a different jurisdiction, equitable tolling is warranted when, as here, reasonable diligence has been shown. *L.A. Printex Industries, Inc. v. At Last Sportswear, Inc.*, 2009 WL 1285923, at *2 (S.D.N.Y. May 4, 2009) ("*L.A. Printex*")

Moreover, Balmuccino cannot be characterized as a chronic litigator. There is nothing frivolous about the instant action or those previously filed and Balmuccino's much-valued trade secrets are at stake. *See id.* Further, Plaintiff was not obligated to abandon its fight in California pending the outcome of the Court of Appeal decision or to abandon its fight in the Ninth Circuit to advance its case in New York. *See id.* Here, there was complete overlap between the filing of Balmuccino's state and federal complaints; they were filed seriatim before the courts in California and Washington even completed their respective appellate reviews.

As the Supreme Court has noted, "[w]hen a lawsuit is filed, that filing shows a desire on the part of the plaintiff to begin his case and thereby toll whatever statutes of limitation would otherwise apply." *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 467 (1962). Defendant has been on notice since at least October 18, 2019 that it must defend against plaintiff's lawsuit and cannot claim that it suffers any prejudice as a result of plaintiff's actions. *See L.A. Printex*, *supra*, 2009 WL 1285923, at *2.

Further, since "the applicability of equitable tolling depends on matters outside the pleadings, it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is

limited to the complaint) if equitable tolling is at issue. *Hoffkins v. Monroe-2 Orleans Boces*, 2007 WL 1288210, at *2 (W.D.N.Y. May 2, 2007), citing to *Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 1003-1004 (9th Cir.2006).  Given the procedurally complex nature of the litigation in state and federal court, Balmuccino maintains that equitable tolling is warranted.

### D.     <u>Balmuccino States a Viable Claim for Breach of Contract and Breach of Confidence, As well as for Trade Secret Violation</u>

As discussed above, Balmuccino maintains it has stated viable claims for breach of implied-in fact and oral contract and for breach of confidence.[6]  With respect to trade secret misappropriation, 'the elements for a misappropriation claim under New York [trade secret] law are fundamentally the same' as a DTSA claim. *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 421 (S.D.N.Y. 2021) (citation omitted).  In this regard, New York law provides that '[a] plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret,' and (2) defendant used such 'secret in breach of an agreement, confidence, or duty,' or after discovery of such secret through 'improper means.'  *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation omitted).

As Starbucks notes, to assess whether a plaintiff misappropriation occurred, New York courts assess the following:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.*

---

[6]The parties agree the Court should dismiss Balmuccino's Count 4 for trade secret misappropriation pursuant to the California Trade Secret Act, but seek leave to amend to restate this cause of action pursuant to New York common law.

As the case law provides, the key element is whether the information was secret—that is, whether a trade secret is disclosed to those who are not obliged to "protect the confidentiality of the information, or otherwise **publicly** discloses the secret, his property right is distinguished." *(Id.*, emphasis added, citations omitted.) However, that is the opposite of what happened here. Rather, the inconvenient truth for Starbucks is that Balmuccino tried to secure a Non-Disclosure Agreement from Gelman, but he refused and rebuffed that request. He did so with the false assurance that none was needed since the Meeting and the items discussed therein were entirely confidential and that the relationship between Mr. Schultz[7] and Dr. Öz, who had brokered the Meeting, should afford Plaintiff the necessary comfort and protections Plaintiff was seeking via the NDA. (Complaint, ¶ 16.)

The Balmuccino team therefore had little choice in the matter—trust the representations a high-ranking Starbucks's official recommended to them through the offices of the company president, or risk a once in a lifetime opportunity to share their novel product design. Disclosure was hardly "voluntary" or readily provided. Rather it was a forced choice. If a mistake was made, it was taking the word of a company spokesperson who then absconded with Balmuccino's trade secret information.

Further, the case upon which Starbucks relies for the proposition that a "request or presumption of confidentiality alone is insufficient to plausibly allege 'substantial measures' taken to protect privacy" is clearly distinguishable. (MTD, p. 28.) In *Pauwels v. Deloitte LLP*, 2020 WL 818742 ("*Pauwels*"), at *8, the parties had developed a "course of dealing,"

---

[7]As alleged, Howard Schultz was the CEO of Starbucks at the time the meeting was arranged with Balmuccino's representatives. (Complaint, ¶ 12.) Dr. Öz was an in-law of one of Balmuccino's managing members, Samantha Lemole. *Id.*, at ¶ 10.

that fostered a "relationship of trust and confidence," such that they had "a tacit agreement" that Defendants would not disclose plaintiff's proprietary financial formulas. *Id*., at *3. Plaintiff further argued that a "confidential relationship" existed as a result of the parties' past "course of dealing," during which the financial model had not been shared with third parties. *Id*., at *8.

By contrast, here, Balmuccino was essentially coerced into disclosure of its trade secret information if its formulations were to be considered by Starbucks. They were damned if they did and damned if they did not share such information. Such "special facts" created a confidential relationship. See *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 587 (2d Cir. 1963) ("*Heyman*"), cited in *Pauwels*, at *8.

The facts in *Heyman* are instructive for the instant case. There, the plaintiff had organized a business dedicated to the manufacture and marketing of a cosmetic product, the formulation for which plaintiff said he disclosed as a trade secret over the course of three meetings with defendants. *Heyman, supra*, 325 F.2d at 586. The court noted that although there was no indication that plaintiff had extracted a promise of trust as to the information disclosed during discussions of defendants' acquisition of the product line, "an express agreement is not a prerequisite to the establishment of a confidential relationship." *Id*. Rather, "[a] relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties." *Id*.

More particularly, the court found that when the parties are a seller and a potential buyer, it can be expected that some disclosures will be made about the thing to be sold "so that the purchaser may rationally assess the merits of concluding the bargain. If the information disclosed is of such a nature as to otherwise qualify as a trade secret, we think

the prospective buyer is bound to receive the information in confidence." *Id.*, at 587. Of

import here, is the finding of confidentiality built into such negotiations, as follows:

> As the prospective buyer is given the information for the limited purpose of aiding him in deciding whether to buy, he is bound to receive the information for use within the ambit of this limitation. He may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing.

*Heyman, supra*, 325 F.2d at 587.

Unlike the instant case, the trial testimony in *Heyman* as to what plaintiff had

disclosed to defendants was in sharp conflict. *Id.,* at 588. This included testimony of a

chemist who had worked for the defendant corporation "on the laboratory development" of

the product. "He testified that he had received from defendants no information whatsoever

as to the ingredients such a product should contain." *Id.,* at 589. This is very akin to the facts

in the instant case where Starbucks's product developer in Washington has sworn the

products at issue were independently developed without use of Balmuccino's formulations.

While the court in *Heyman* eventually found plaintiff had not carried his burden of proof as

to whether he had disclosed the formula for his product or of its ingredients in meetings with

defendants (*id*), here there is little doubt this occurred, especially given allegations that

Defendant's representatives contacted Balmuccino's manufacturer shortly after the Meeting.

Further, it begs the question to say, as Starbucks does, that it did not act in bad faith,

such as by way of a fraudulent misrepresentation. Rather, the facts delineated in the

Complaint would certainly support a finding of such a misrepresentation. As alleged,

Gelman falsely assured Balmuccino that its product information would be held in confidence,

so that an NDA was not needed. Gelman knew his assurance of confidentiality was false so

as to trick Plaintiff into divulging proprietary information. Hence, Plaintiff reasonably relied on Gelman's misrepresentation to its harm, which included being denied any share in profits which may have derived from the promotional use of Balmuccino's lip product formulation, which was expected to drive business to Starbucks's retail stores.

Moreover, Plaintiff's Complaint adequately describes the economic advantage of not having Balmuccino's trade secret known to others. The line of coffee-flavored lip balm products Balmuccino advanced to coffee giant Starbucks were developed into fully realized prototypes for a lip balm line tailored to Starbucks's products. (Complaint, ¶ 1.) That this had economic value to Starbucks is evident in the fact that after the Meeting, Starbucks's Research and Development personnel contacted one of Balmuccino's suppliers to create prototypes for Starbucks-branded lip balm-type products and lip balm cases. *Id.* It did so using specifications that <u>matched</u> those which Plaintiff had provided to Mr. Gelman during the Meeting. *Id.* Thereafter, in 2019, Starbucks ran a promotion to drive business to its retail stores. *Id.*

As alleged, Balmuccino had begun developing a line of coffee-flavored lip balm products in 2016 and then sought out an entity with which it could manufacture and sell its products. (*Id.*, at ¶¶ 8-9.) In the process, Plaintiff sought to protect the process and formulation of its lip balm products from disclosure and requested use of an NDA, which the Head of Product Development, Gelman, refused to sign, indicating instead that Starbucks was trustworthy because Starbuck's CEO had sanctioned a meeting with Gelman. (*Id.*, at ¶ 16.) As alleged, the fully developed concept misappropriated by Defendant reflects the huge investment of time, energy and funds Plaintiff had expended to develop the product and the prototypes that Starbucks unceremoniously took for itself. (*Id.*, at ¶ 28.) It is equally clear

Defendant misappropriated the organic entrepreneurship, creativity, hard work, and invention Plaintiff demonstrated at the New York Meeting and then sought to monetize Plaintiff's creation without due compensation to Balmuccino--all to Balmuccino's injury. (*Id*.)

As alleged, information pertaining to the development of Balmuccino's products was unknown to the public and known only to Balmuccino's Members and their suppliers/agents, all of whom understood that such information should not be disseminated unless for business purposes and to persons who understood the confidentiality of such information. (*Id*., at ¶ 69.) That information had economic value since it was required to create Plaintiff's products, and allowed for the creation of a competing product, and also afforded reasons as to why Plaintiff's products had economic value in the existing marketplace. (*Id*.) Plaintiff maintains that its losses from Starbucks's misappropriation of its trade secret and its commercial exploitation of its research and development posed a loss to Balmuccino of not less than $75,000. (*Id*., at ¶ 75.)

The cases upon which Starbucks tries to undercut the significance of these facts in establishing trade secret misappropriation, are inapt. First is the matter of *24 Seven v. Martinez*, 2021 WL 276654 (S.D.N.Y. Jan. 26, 2021). There, the issue of trade secret information rested on four main types of a staffing agency's information: (i) client and candidate names and key contacts; (ii) insight into particular clients' preferences; (iii) details about pricing and about pricing and profit margins; and (iv) employee materials. *Id*., at *6, *9. In denying trade secret status to this information, the court stated the staffing agency's clients were large global companies that did not exclusively use plaintiff for its staffing needs and that plaintiff's candidates disseminated their information broadly to find recruits. *Id.,* at *6-7. In that the agency's clients and candidates were readily identifiable in the industry, that

information was not a trade secret. *Id.* Further, resources spent on recruiters, job fairs, advertising, and industry events to obtain its customers' hiring preferences and contact information highlighted how readily available this information was to others in the industry. *Id.* As such, this case is inapt.

Starbucks next relies on the case of *Investment. Science., LLC v. Oath Holdings Inc.* 2021 WL 3541152, at *2 (S.D.N.Y. Aug. 11, 2021) to argue that "formulaic recitation of an element" of a trade secret misappropriation claim is insufficient. Here, however, there is nothing speculative or formulaic about the Meeting, the fact that Gelman elicited specific information concerning the fabrication of the products at issue, that Gelman not only refused to sign an NDA, but kept the pitch deck, that soon after the Meeting, Starbucks's personnel were trying to elicit information on the production of Balmuccino's lip balms from Balmuccino's manufacturers who, in turn, informed Balmuccino of the irregularity, and that, in April 2019, Starbucks ran a promotion using coffee-flavored lip products to drive sales at its coffee shops. These are not conclusory; they are factual.

*Zabit* v. *Brandometry, LLC*, 540 F. Supp. 3d 412 (S.D.N.Y. 2021) ("Zabit") is also distinguishable. There, intellectual property information related to stock market picks was not kept confidential by the owner of the information in that licensees had access to the algorithms underlying the subject index, lacked instruction to maintain the algorithm secret or as to other protective security measures. (*Id.*, at 424-425). By contrast here, Starbucks was in a superior bargaining position and refused to enter into an NDA, which gave Balmuccino a Hobson's choice—to rely on the guarantee of confidentiality Gelman had promised in lieu of an NDA or to walk away from its investment of time and money to partner with Starbucks

for the commercial application of its trade secrets.  The facts are very different in the instant case from those of *Zabit*.

Finally, Starbucks's reliance on *Big Vision Private Ltd. v. E.I. Dupont De Nemours & Co.,* 1 F. Supp. 3d 224 (S.D.N.Y. 2014) is also inapt.  Starbucks relies on that case for the proposition that "where an alleged thief's products lack a suspicious similarity to the secrets, the inference would not lie." (*Id.*, at 275.)  Here, the Defendant tries to distinguish between its lip gloss products and Balmuccin's lip balm products. (MTD, p. 30.)  At this early stage in the litigation, this is pure speculation.  Some lip balms may color the lips and some lipsticks/glosses may also soothe the lips.  It is premature to draw any meaningful distinction at this stage of the litigation.  What is known is that Starbucks sought out the manufacturer of Balmuccino's products not long after the Meeting and not long after that, Starbuck's promoted some of its products based on a lip application that mimicked Starbuck's' flavors.

In sum, none of the authorities that Starbucks relies on to attack Balmuccino's Complaint are dispositive.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, the Motion to Dismiss should be denied.

DATED: January 3, 2025                **MARTORELL LAW APC**

By: *<u>/s/ Eduardo Martorell</u>*
      Eduardo Martorell
      Martorell Law APC
      6100 Center Drive, Ste. 1130
      Los Angeles, CA 90045
      Tel: (323) 840-1200; Fax: (323) 840-1300
      Email: EMartorell@Martorell-Law.com

      Attorneys for Plaintiff